Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

JASON WADDELL, as                )
Guardian Ad Litem of Lacee       )
Danielle Marez, an               )
incapacitated person,            )
          Plaintiff,             )
VS.                              )Case No. CIV-11-1037-D
                                 )
BOARD OF COUNTY                  )
COMMISSIONERS OF CLEVELAND       )
COUNTY,                          )
JOSEPH LESTER, in his            )
official capacity                )       COPY
CALISTA HULLETT f/k/a            )
CALISTA HARLOW, individually )
and in her official capacity,)
ESW CORRECTIONAL                 )
HEALTHCARE, LLC, an Oklahoma )
limited liability company,       )
SOONER MEDICAL STAFFING,         )
LLC, an Oklahoma limited         )
liability company,              )
          Defendants.            )

DEPOSITION OF JOE. K. LESTER

TAKEN ON BEHALF OF THE PLAINTIFF

IN NORMAN, OKLAHOMA

ON OCTOBER 18, 2013

REPORTED BY:  SUSAN J. FENIMORE, CSR, RPR

METROPOLITAN BUILDING          MID-CONTINENT TOWER
400 North Walker, Suite 160    401 South Boston, Suite 310
Oklahoma City, OK 73102            Tulsa, OK 74103
405-235-4106                       918-599-0507

depo@drreporting.com

**D&R REPORTING & VIDEO, INC.**

ATTACH. 2

Joe Lester                                              October 18, 2013

1                       Joe K. Lester,

2      after having been first duly sworn at 11:01 a.m.

3      deposes and says in reply to the questions propounded

4      as follows, to wit:

5                       * * * * * *

6                    DIRECT EXAMINATION

7      BY MR. ERDOES:

8           Q     Would you state your full name please?

9           A     Joseph K. Lester, L-e-s-t-e-r.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Joe Lester                                    October 18, 2013

1

2

3

4

5

6

7

8

9

10      Q      Tell me what you understand this lawsuit's

11   about.

12      A      I understand that a person was -- had gone

13   to court for failure to appear, showed up in the

14   afternoon, they were supposed to be there in the

15   morning, and that the judge ordered the deputies to

16   take them into custody.  And that a subsequent search

17   of the young lady's purse was made in the booking

18   area and drugs were found in it.

19           When they were changing her out, they found

20   that she was trying to hide drugs that were in her

21   underwear and that she had put some pills in her

22   mouth and they had her spit them out.

23      Q      And that's what this lawsuit is about?

24      A      And that she was charged with that, she was

25   placed in -- she had filled out her medical form, she

Page 13

1   had checked -- I read the medical form.  Several

2   boxes on it are medical check in.

3          She had been placed in a cell because of

4   her possibly swallowing one of these pills.  I read a

5   report where the nurse checked on her later and then

6   said she was fit to go in to the -- back to the cell

7   at that time.

8          And three days later she was heard gurgling

9   by somebody on a top bunk and they pushed the buzzer

10  and the detention staff came and cleared the other

11  people out, put them in other cells, which is policy,

12  to lock everybody down for the safety of the

13  detention personnel.  And they proceeded to give

14  first responder aid to her and ambulance was called

15  and she was transported to Norman Regional where she

16  remains in -- not in Norman Regional, but she remains

17  in a coma.

18

19

20

21

22

23

24

25

Joe Lester                                          October 18, 2013

Page 16

1

2

3

4

5

6

7

8

9

10

11

12

13      Q      You are the final policy maker for the

14  Cleveland County Sheriff's Office; is that right?

15      A      Yes.

16      Q      The buck stops with you; is that a fair

17  statement?

18      A      I make -- I make the final decision on all

19  policies.

20      Q      You make the hiring and firing decisions

21  for your staff?

22      A      I am the final approval of all hiring and

23  firing.

24

25

Joe Lester                                        October 18, 2013

Page 23

19    Q    All right.   Tell me what those other things
20  that were going on that you referenced that led you
21  to start negotiating in January of 2009 with Sooner
22  Medical?
23    A    The first full week that I was in office,
24  my fiscal unit head and her assistant came into my
25  office carrying a bunch of envelopes that were

Joe Lester                                          October 18, 2013

Page 24

1    unopened, unpaid medical bills to Norman Regional

2    Hospital and other providers.  And they said that

3    they had a whole desk full of these things, that they

4    ultimately went back for the interim sheriff's tenure

5    to Sheriff Beggs' tenure where they just hadn't paid

6    these bills.  And I knew that we had some liability,

7    we were getting calls from the providers that they

8    wanted their money, half the money for the department

9    had been spent already.  And we didn't have -- I

10   think it was around 600,000 at that time, ultimately

11   it came up to over a million dollars in unopened,

12   unpaid medical bills and --

13        Q    Were these all medical bills as a result of

14   treatment to detainees, inmates?

15        A    They had been sent to Norman Regional

16   Hospital and when somebody goes to the hospital,

17   whether it's a headache or what, it's a big expense.

18   And at that time they had a nurse that would come to

19   work eight hours a day and I thought that they needed

20   somebody there, a nurse there 24-7 for the size of

21   the jail.

22             At that time I called my campaign

23   strategist, because when I was running, he had

24   introduced me to John Echols and --

25        Q    And who is John Echols?

Joe Lester                                        October 18, 2013

1      A      He was -- at that time he was running for a

2    state house seat, same time I was running for

3    sheriff.   He lost that house seat.   I think he was

4    running against Mike Reynolds.

5           And in talking to him at some political

6    event, I found out that he provided nurses for

7    nursing homes throughout the state.   And I went to

8    him and asked him if they ever thought about

9    broadening their horizons and he asked what I meant

10   and I told him what I was faced with and what I

11   wanted to do.

12          They came down, they evaluated our facility

13   at the old jail, went back and forth.   He worked with

14   Dave Batton from the district attorney's office,

15   contract was drawn up and it took from that time

16   until March for the commissioners to approve that

17   contract, that final contract that was done.

18

19

20

21

22

23

24

25

Joe Lester                                              October 18, 2013

Page 29

4        Q      Your proposed plan of correction when you

5    first were cited, given a notice of violation of the

6    prison overcrowding conditions, was to move

7    additional inmates to the Pottawatomie County jail to

8    reduce your prison population; is that right?

9        A      Yes, that was in 2009, yes.

Joe Lester                                                    October 18, 2013

                                                                    Page 31

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18        Q     Do you have agreements with neighboring

19   counties to house your detainees when your jail is

20   overcrowded?

21        A     The county commissioners had an agreement

22   with Pott County to take prisoners when we were

23   getting a lot of overcrowding issues from the jail

24   inspector.

25

Joe Lester                                          October 18, 2013

Page 32

1

2

3      Q    Did you have to pay the Pottawatomie County

4   Commissioners for housing your detainees and inmates?

5      A    The Pott County jail is not operated by the

6   county commissioners, it's operated by a trust.  And

7   our county commissioners are the ones that entered

8   into that agreement with the trust of Pott County to

9   take the prisoners over to their jail and they housed

10  them there.

11     Q    But I guess my question is did your county

12  have to pay the trust in Pott County, regardless who

13  the governing body is that oversaw the jail?

14     A    Yeah, the county commissioners' budget paid

15  for that.

16     Q    Now, do you house prisoners or detainees

17  that are from other counties and get paid in turn by

18  those counties?

19     A    No.

20     Q    What about DOC inmates, do you house DOC

21  inmates and get paid by the State Department of

22  Corrections for housing those?

23     A    I do now.

24     Q    Did you back in 2009?

25     A    No.

Page 33

1      Q      When you had a prisoner who had been

2   sentenced, meaning he was going away and not going to

3   be spending time in the county, but actually in a

4   state --

5      A      Yes.

6      Q      -- run facility, was there a method by

7   which that prisoner could be expeditiously removed

8   from the facility to reduce your overcrowding?

9      A      Yes.

10     Q      Tell me about that.

11     A      We were on an emergency pickup order for

12  the state prisons because of our overcrowding and we

13  would take them there.  The only time that during all

14  of our overcrowding at that time that we had those

15  state prisoners would be if the district attorney's

16  office had us go pick up a prisoner at the prison to

17  bring back, he or she may be incarcerated in the

18  state prison but have additional charges here or have

19  a hearing to get some charge reduced or whatever, but

20  we would have to bring them back and we would house

21  them until that hearing and then transport them back

22  to the prison.

23

24

25

Joe Lester                                          October 18, 2013

Page 37

19          (Exhibit Number 6 marked for identification
20          purposes and made part of the record.)
21     Q      (By Mr. Erdoes) Now, here is Exhibit 6.
22  This is dated March 9th, 2009.  This is now when you
23  have taken over as the sheriff; is that right?
24     A   · Yes.
25     Q     I believe it may have been -- was it the

1    first inspection after you were sworn in?

2         A    I had in January of 2009, I forget his

3    name, but the head of the -- of the jail inspectors,

4    brought him down to the sheriff's office, he came

5    down and met with me and we had about a two-hour

6    meeting where he toured the jail with me and saw that

7    it was overcrowded.  And they had just passed the

8    bond issue in November to build the new jail and it

9    was going to happen.

10              He was instrumental in getting that

11   happening and going to the commissioners and telling

12   them that they were going to be fined if they didn't

13   get a new jail built.

14              And I believe also during that time we had

15   a discussion about none of the employees working in

16   the jail, and I think we had 22 at that time, to

17   watch around the clock, seven days a week, that none

18   of them had received the jail standards training

19   and --

20         Q    When did you discover that?

21         A    When I first got in.

22         Q    All right.  So what did you do to correct

23   that situation?

24         A    Worked with him and Ed Miller, who was the

25   acting head of the jail, and I believe it was Alicia,

Page 39

1    who's the jail inspector.

2         Q    Alicia Dickson?

3         A    Yeah. I believe --

4         Q    Or Dickerson?

5         A    -- she and somebody came down and taught

6    the -- all the employees and gave them the test and

7    they all passed.  And then we began hiring additional

8    personnel starting my second week in office to

9    increase the number of staff in the jail for the

10   protection of both the inmates and the employees.

11        Q    When was the new jail finally opened for

12   business?

13        A    We're coming up in February for our second

14   year.  So a year ago last February.

15        Q    February of 2012 is --

16        A    Yes.

17        Q    So three years after you took office is

18   when the jail was finally opened?

19        A    Yes.

20        Q    All right.  So Exhibit 6 we now know was

21   your first jail inspection and according to

22   Ms. Dickerson, the lady you mentioned earlier as

23   being the state investigator or inspector, she found

24   that you had women and other male prisoners sleeping

25   on the floor in their cells; is that right?

1      A      Yes, in what we call boats with mattresses.

2      Q      But it was still a deficiency, according to

3 the state health department, correct?

4      A      Yeah, because of the overcrowding, yes.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Joe Lester                                              October 18, 2013

Page 41

12      Q    (By Mr. Erdoes) What led to that large

13  increase in population?

14      A    You know, I don't know what exactly led to

15  it, but I would imagine that it would be Oklahoma

16  City, Moore, Norman, Noble and Lexington and OU

17  Police Department arresting more women for various

18  charges and the judges holding them in jail for

19  whatever reason.

Joe Lester                                    October 18, 2013

Page 42

8       Q      Had you entered into any agreements to get
9   paid by other counties or other agencies, be it DOC
10  to house their inmates or detainees by that time?
11      A      Not then and not now.

Joe Lester                                          October 18, 2013

1

2

3

4

5

6

7

8        Q      (By Mr. Erdoes) Now, just before we got

9    off track, we asked about who is medical authority

10   according to these records from the state health

11   department and we discussed Sooner Medical or

12   SoonerCare, you mentioned you read the contract that

13   was attached to Sheriff Lester's --

14        A      No.

15        Q      Sheriff Burnett's deposition, correct?

16        A      To Undersheriff Burnett's.

17        Q      Did you read the portion where it said that

18   ESW was a subsidiary of Sooner Medical?

19        A      Yes.

20        Q      Do you understand what that means?

21        A      My understanding, when they changed that,

22   in talking with Mr. Echols, Sooner Medical, as I

23   mentioned before, provided nurses to nursing homes

24   throughout the state.  And they wanted to break off

25   the jail part of it to get it away from Sooner

Joe Lester                                              October 18, 2013

Page 47

1    Medical so they could, I guess, do the books and

2    expand from this county to other counties to provide

3    the same service.

Joe Lester                                          October 18, 2013

Page 49

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11        Q     And A pod is the area where the women are

12   housed at the old Cleveland County Detention Center?

13        A     Yes.

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2          Q     Let me stop you right there.  What do you

3     mean by "if you build it, they will come"?

4          A     Well, we have the room now and before when

5     we were in the old jail, I had discussions with the

6     police chiefs of Moore and Norman that when you have

7     municipal prisoners, write them the tickets, you

8     know, have your officers write, don't get -- don't

9     get our jail overcrowded, we can't hold them.

10         Q     Did they comply with your request?

11         A     To the biggest part they did.  But when

12    you -- when they would have a drunk individual, they

13    would bring them to the jail.

14         Q     You don't want to fill your jail with drunk

15    individuals, do you?

16              MS. FAGAN:  Object to the form.

17              MS. LEE:  Same objection.

18              THE WITNESS:  I don't want to fill my jail

19    with anybody.  I look for ways to keep the jail

20    population down.

21

22

23

24

25

Joe Lester                                          October 18, 2013

Page 69

1

2

3

4        Q    Okay.   What is the purpose of site checks,

5   sir?

6        A    To make sure that everything is okay.

7        Q    What exactly does the site check entail

8   when you are conducting a site check of all areas of

9   each cell?

10       A    The status of the individuals in those

11  cells.

12       Q    You're checking on the safety and

13  well-being of the people in the cells, correct?

14       A    Yes.

15

16

17

18

19

20

21

22

23

24

25

Joe Lester                                    October 18, 2013

Page 70

12      Q      (By Mr. Erdoes) The cellmates have an
13  intercom system where they can alert --
14      A    Yes.
15      Q      -- your staff of any deteriorating health
16  conditions of a detainee as well, correct?
17      A    Yes.

Joe Lester                                        October 18, 2013

Page 71

12      Q      Once someone is housed in a cell though,

13   and their health is deteriorating in such a manner

14   that they need medical attention, who makes the

15   decision on whether to have that person removed from

16   your facility for outside medical treatment under

17   your current contract with ESW and Sooner Medical?

18      A      Under the contract that we had during this

19   occurrence?

20      Q      Right.

21      A      Would be Sooner Medical.

Joe Lester                                          October 18, 2013

Page 78

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16        Q      (By Mr. Erdoes) Well, your policy is that,
17   according to what I've read in your detention manual,
18   that you're to provide the medical care and treatment
19   for detainees equivalent to that of what citizens in
20   the community would receive, do you remember reading
21   that in your --
22        A      Yes.
23
24
25
```

Page 84

```
 1
 2
 3
 4
 5
 6              (Exhibit Number 20 marked for
 7              identification purposes and made part of
 8              the record.)
 9       Q      (By Mr. Erdoes) Have you seen a copy of
10   this document before, sir?
11       A      Yes.
12       Q      Is that your use of force policy?
13       A      Yes, and that's standard throughout the
14   profession.
15       Q      Okay.  That's the use of force policy that
16   you have in place at the detention center; is that
17   right?
18       A      Yes.
19       Q      It says under the policy that, "Physical
20   force may be used only when an attack by an inmate on
21   a facility employee, visitor, or other inmate is
22   actually occurring, is clearly imminent, or when
23   other lesser means have failed to achieve a
24   legitimate and necessary objective."  Do you see
25   that?
```

Joe Lester                                          October 18, 2013

1        A     Yes.

2        Q     Then it specifically says, "Physical

3   punishment of an inmate by a deputy shall not be

4   permitted under any circumstances."  Do you see that?

5        A     Yes.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Joe Lester                                          October 18, 2013

Page 103

1

2

3      Q    Under the contract that we were previously

4 talking about, we talked about how the maximum

5 liability was $50,000 for any off site medical care,

6 correct?

7      A    Yes.

8      Q    Now, isn't it true if ESW determined that

9 it was a preexisting condition of an inmate, then

10 they would not pay for it, even if it was within the

11 $50,000 maximum liability?

12         MR. ERDOES:  Object to the form.

13         THE WITNESS:  That is correct.

14     Q    (By Ms. Lee) And also, it was ESW's

15 responsibility to, according to the contract, fill

16 out insurance claims on behalf of the inmates if they

17 had insurance?

18     A    Yes.

19

20

21

22

23

24

25

**RECEIVED**

**OKLAHOMA STATE DEPARTMENT OF HEALTH**
**PROTECTIVE HEALTH SERVICES**
Jail Inspection Division
1000 NE 10th Street
Oklahoma City, OK 73117-1299

MAR 1 6 2009

Jail Inspection Program

**JAIL INSPECTION REPORT**
Telephone: (405) 271-3912 Fax: (405) 271-5304
www.health.ok.gov
DATE: _5-9-09_

PAGE OF _1_ OF _2_

Type of Facility: (Circle One)   (COUNTY)   CITY   LOCK-UP   HOLDING

Facility: _Cleveland_   Address: _203 S Jones_

City: _Norman_   County: _Cleveland_   Zip: _73064_

Sheriff/Chief: _Lester, Joe_   Jail Administrator: _Ed Miller_

Area Code: _405_   Office Phone: _366-5778_   Jail Phone: _321-8600_

Medical Authority: _none at this time, Norman Regional for emergency._

Staffing: Day Shift(M) _4_ (F) _1_   Evening (M) _3_ (F) _2_   Night(M) _4_ (F) _1_

Total Male Beds: _133_   Female Beds: _16_   Juvenile Beds: _can't hold_   Special Cells: _0_

Population Today: _241_   Rated Capacity: _171_   Avg. Daily Population: _185_   Men _165_   Women _20_

Sentenced:   Male _13_   Fem _____   Juv Male _8_   Juv Fem _1_   Total _X 21_

Unsentenced:   Male _205_   Fem _23_   Juv Male _____   Juv Fem _1_   Total _228_

DOC J&S: _13_   Menu Approved by Licensed Dietitian (long Term Jail Only)   yes _✓_ no _____

Food Prepared By: _Trusty + Jail Super._

**DEFICIENCIES:** Chapter 310:670

_5-8-(1)_   _The facility does not have a health care plan + no_
_assistance from a medical authority, nor does the_
_facility have a designated medical authority._
_There is no plan of responsibility regulation written_
_job description, because there is no medical authority._

_5-8-(1e)_   _This facility does not have 24 hr medical authority._

_5-11-(2)_   _(Trusty Pod) Receiving, female pod, B pod has 24, C Pod-28, D-Pod-8_
_have prisoners sleeping on the floor. Not enough jail bunks._
_(E Pod-2) prisoners -8 beds, F pod -11 prisoners 16 bunks, g-47 pris -24 bed, H pod 47= 24 beds_
_also called_
_Trusty Pod._

I ACKNOWLEDGE RECEIPT OF THIS REPORT
AND SWEAR THAT THE INFORMATION GIVEN
BY ME IS TRUE TO THE BEST OF MY KNOWLEDGE.

_Chief E. Miller_

**Signature of Jail Representative**

I CERTIFY THAT THIS INSPECTION COVERED
ALL APPLICABLE STANDARDS.

_Alicia Dickson_

**Signature of Inspector/Investigator**

_405-203-5710 Cell_

**Inspector's Telephone Num**

Oklahoma State Department of Health
Protective Health Services

_escorted to/Ed + visited w/sheriff + undersheriff._

**EXHIBIT**
tabbies
_6_

4.08 USE OF FORCE

POLICY

Only that amount of physical force necessary to maintain or regain control of any inmate will be used by the staff of the Detention Center. Physical force may be used only when an attack by an inmate(s) on a facility employee(s), visitor(s), or other inmate(s) is actually occurring, is clearly imminent, or when other lesser means have failed to achieve a legitimate and necessary objective. Physical punishment of an inmate by a Deputy shall not be permitted under any circumstances.

PROCEDURE

The following procedural guidelines are designed to illustrate that Deputies have a number of choices in handling violent or potentially violent situations in order to give an inmate every opportunity to cease his/her disruptive or assaultive activity and cooperate with the Deputy. The following steps should be followed whenever possible in sequence:

1. Uncooperative inmate: The Deputy who encounters an uncooperative inmate (e.g., refuses to enter cell, refuses the frisk search, refuses to be removed from cell) will take the following actions:

a. Verbal Persuasion: Attempt to convince the inmate to cooperate.

b. Verbal Warnings: If verbal persuasion fails, warn the inmate of the consequences of non-cooperation (use of force, disciplinary sanctions).

c. Show of Force: If warnings are not effective, call for backup personnel in an attempt to intimidate the inmate through a show of force.

d. Control Holds: If a show of force is insufficient (or impossible) the Deputy shall attempt to use the physical holds designed to gain control of the inmate (no blows will be struck by the Deputy unless the resisting inmate becomes an attacker).

EXHIBIT

20

tabbies®

ESW00213